IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                                    No. CR13-3016

TIMOTHY KOENCK,                            TRANSCRIPT OF
                                           SENTENCING

      Defendant.
_____/


      The Sentencing held before the Honorable Mark W.
Bennett, Judge of the United States District Court for the
Northern District of Iowa, at the Federal Courthouse, 320 Sixth
Street, Sioux City, Iowa, February 3, 2014, commencing at 1:30
p.m.


APPEARANCES

For the Plaintiff:        TIMOTHY T. DUAX, ESQ.
                          Assistant United States Attorney
                          Terra Centre - Suite 670
                          600 Fourth Street
                          Sioux City, IA  51101


For the Defendant:        BRADLEY RYAN HANSEN, ESQ.
                          Assistant Federal Defender
                          Suite 400
                          701 Pierce Street
                          Sioux City, IA  51101

Also present:             Chad Zach, U.S. Probation

Reported by:              Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

1          THE COURT:  Thank you.  Please be seated.  Good

2     afternoon.

3          THE CLERK:  This is Case Number 13CR3016-1, United

4     States of America versus Timothy Koenck.  Counsel, please state

5     your appearance.

6          MR. DUAX:  Tim Duax appearing on behalf of the United

7     States.

8          THE COURT:  Good afternoon, Mr. Duax.

9          MR. DUAX:  Good afternoon, Your Honor.

10          MR. HANSEN:  Brad Hansen for Timothy Koenck, Your

11     Honor.  Good afternoon.

12          THE COURT:  Good afternoon, Mr. Hansen.  And thank you

13     for filing a comprehensive brief in this matter which I've given

14     a lot of thought to over the weekend.

15          Have you had a full, fair, and complete opportunity to

16     review the presentence report with Mr. Koenck?

17          MR. HANSEN:  Yes, Your Honor.

18          THE COURT:  And do you agree that the total offense

19     level is 34, criminal history category 5, advisory guideline

20     range on Counts 1, 6, and 7 235 months to 293 months; Count 1

21     carries a statutory maximum of life; Count 6 and 7 carry

22     statutory maximum terms of 20 years; Count 2 is a 10-year

23     mandatory minimum, and that must run consecutive to Count 1?

24     Did I get that right?

25          MR. HANSEN:  I agree with all that, Your Honor.

1    THE COURT:  And does the government agree with that?

2    MR. DUAX:  Yes, Your Honor.

3    THE COURT:  Okay.  And the only issue really is your

4  motion for downward variance; is that correct?

5    MR. HANSEN:  I believe so, Your Honor.

6    THE COURT:  Okay.  Why don't we hear argument on your

7  motion.

8    MR. HANSEN:  Thank you, Your Honor.  At the outset

9  before I forget, I'd like to move for admission of Defendant's

10  Exhibit A which consists of A1 through A23.

11                    *    *    *    *

12             (Defendant Exhibit A was offered.)

13                    *    *    *    *

14    THE COURT:  Any objection?

15    MR. DUAX:  No objection, Your Honor.

16    THE COURT:  Those exhibits -- I guess that exhibit

17  with the subsections is admitted.

18                    *    *    *    *

19             (Defendant Exhibit A was admitted.)

20                    *    *    *    *

21    MR. HANSEN:  Thank you, Your Honor.  On the motion for

22  a downward variance, I'm relying on two bases somewhat related

23  but two separate bases.

24        The first in my sentencing memorandum and the first

25  that I'll address is a policy-based argument against United

1    States Sentencing Guideline 4B1.5(a) in this case.  Effectively
2    this is the career offender provision for sex offenders.  It
3    says so essentially right in the amendment that brought about
4    this change to the guidelines in 2001 that this guideline,
5    4B1.5, works in tandem or together with the career offender
6    provision.  So in a lot of ways, it has many similarities to the
7    career offender provision that the Court has addressed on many
8    occasions and --
9             THE COURT:  Well, in some respects it's harsher, isn't
10   it, because it only requires one predicate offense?
11            MR. HANSEN:  Correct, Your Honor.
12            THE COURT:  Although there are two predicate offenses
13   here.
14            MR. HANSEN:  There are two predicate offenses here,
15   Your Honor, including --
16            THE COURT:  Including the one that I sentenced the
17   defendant on.
18            MR. HANSEN:  Right, Your Honor.  That's correct.
19            THE COURT:  And I showed him considerable leniency in
20   that sentencing.  I actually recall that sentencing.
21            MR. HANSEN:  I agree with that.  A 57-month sentence,
22   I believe, in that case was indeed reasonable and lenient.  So
23   yes, the Court's correct.  In some ways the repeat and dangerous
24   sex offender guideline is more severe than the career offender
25   provision in that it only requires one predicate offense.

1      THE COURT:  Now, why do you think that might be?

2      MR. HANSEN:  That's hard to know.  I scoured the

3   legislative history.  My best interpretation from looking at the

4   congressional record and looking at the amendment itself and the

5   reasons for the amendment is that this change to the guidelines

6   came about in the same time period as the child pornography

7   guidelines were getting ramped up.  So it came about at a time

8   that there was a lot of worry about whether child pornography

9   offenses were punished severely enough or whether in this case

10  more severe, frankly, sex offenses are being punished enough.

11      So that's my best guess as to why the career offender

12  provision is a little more forgiving, for lack of a better way

13  to put it, than the repeat and dangerous sex offender guideline

14  but could not find anything expressly in the congressional --

15  the legislative history to reflect that.

16      But like the career offender provision, the table in

17  4B1.5 is keyed to statutory maximums.  So we're not talking

18  about a case in which this guideline is the -- based off of

19  empirical data or sentencing data generally.  It is keyed to the

20  statutory maximum and keyed based on what I said in my

21  sentencing memorandum a goal of incapacitating repeat sex

22  offenders and punishing them severely.

23      So whereas those are certainly valid considerations

24  for the Court under 18 U.S.C. 3553(a), as I said in my memo,

25  there has to be more.  There has to be a consideration of the

whole defendant, not just the fact that he has a predicate offense that puts him under this guideline and then obviously an instant offense as it does as well or in this case two predicate offenses.

So it's a severe guideline just like the career offender provision keyed to the statutory maximum. I have to acknowledge the, I guess, weakness in this part of my argument based on the sentencing that I had before Your Honor last week that the career offender -- the policy disagreement that you have with the career offender provision is quasi-categorical.

So I think for Mr. Koenck to get relief under my first argument, you would have to effectively say he's kind of like a Lori Newhouse for the repeat and dangerous sex offender provision, and that might be admittedly hard to do.

But I do think, as I said last week in the sentencing we had on Friday, that the problems with the repeat and dangerous sex offender guideline, 4B1.5, are like the career offender provision. They're universal. They are problems in the genesis of the guideline. And I think that that's cause for relief for Mr. Koenck in that respect because the guideline under which he falls wasn't necessarily the product of a fair consideration and a thoughtful consideration by the sentencing commission.

And independently but also relatedly, as I said, I think there's grounds for a variance on 3553(a) grounds.

1    Certainly I cannot argue that the nature and circumstances of

2    the instant offense are grounds for a variance.  It's a very,

3    very serious offense obviously as the Court recognizes.

4         And in terms of history and characteristics, there are

5    also aggravating circumstances certainly in Mr. Koenck's

6    criminal history.  But as I said in my sentencing memo, there

7    are mitigating circumstances.

8         Mr. Koenck obviously has a severe problem with sex

9    offenses for lack of a better way to put it.  But he's also a

10   guy that obviously in my short time of being in the federal

11   public defender's office we have never received as many letters

12   of reference as we did for Mr. Koenck.  And they were good

13   letters.  They were very good letters, very thoughtful letters

14   from both family and actually primarily members of the Fenton,

15   Iowa, community.

16        This is a guy who -- it's tough to say this, but but

17   for what he's done that's led him to be prosecuted for sex

18   offenses, this is a guy that was a model member of the

19   community.

20             THE COURT:  Well, I don't disagree with that.

21             MR. HANSEN:  Right.

22             THE COURT:  But that's a big thing to overlook.

23             MR. HANSEN:  That's a big but, Your Honor, I agree.

24             THE COURT:  It's a very large Mount Everest to climb.

25             MR. HANSEN:  I agree, Your Honor.

1          THE COURT:  It's like climbing Mount Everest on one

2    leg with no supplemental oxygen and no outdoor heavy-duty gear.

3          MR. HANSEN:  I think of myself as rather physically

4    fit, but I could not do that, Your Honor.

5          But the whole person, the whole Timothy Koenck, is a

6    guy who was a valuable member of the Fenton, Iowa, community,

7    and I think that's borne out by the 23 letters of recommendation

8    as the Court recognized.  This also was not a guy who -- beyond

9    his good deeds in the community, he's a guy who was socially

10   productive.  He has a college degree.  He had good jobs which,

11   you know, somewhat of a double-edged sword in that it makes it

12   all the more galling that we're here on a case like this.  But

13   he's a guy who has lived a productive life, again, but for what

14   he's done that's led him to be here today.

15         And I think the last thing I want to touch on was my

16   argument regarding Mr. Koenck's age.  He's 54 years old as of

17   today, and I think although no one knows how long someone's

18   going to live, I think it's safe to say that if he gets what the

19   guidelines recommend plus the 120-month consecutive mandatory

20   he'll probably die in prison.  And I pointed to United States

21   versus Craig.

22         THE COURT:  Yeah, I'm familiar with that case.

23         MR. HANSEN:  Yeah.

24         THE COURT:  And Judge Posner's concurring opinion in a

25   per curiam decision.

1          MR. HANSEN:  Right.  Concurring opinion, Seventh

2     Circuit, certainly no binding authority on the Court, but I pose

3     it as a consideration for the Court in determining whether -- I

4     mean, there's going to be a long sentence in this case but

5     whether it should be a super long sentence.

6          And I think some of the statistics that Mr. -- Mr. --

7     Judge Posner cited in Craig are relevant here.  It's certainly

8     true that sex offenders generally are more likely to recidivate.

9     But as Judge Posner said, in terms of comparing an elderly sex

10    offender to a non-elderly sex offender, the elderly sex offender

11    is far less likely to commit a new offense and --

12          THE COURT:  And the facts in that case are pretty

13    egregious too.

14          MR. HANSEN:  Right.

15          THE COURT:  Yeah.

16          MR. HANSEN:  Right.  If I'm --

17          THE COURT:  Not all that dissimilar from this offense

18    as I recall.

19          MR. HANSEN:  I agree with that, Your Honor.  So I ask

20    the Court -- the Court's already seen United States versus

21    Craig.  I ask the Court to consider it and consider what Judge

22    Posner had in there.

23          And a factor that this Court has considered before

24    related to age is a sentence, a variance in this case, would

25    allow for Mr. Koenck to have hope for release which is a factor

1    that bears on his rehabilitation, the ability of prison

2    officials to make sure he behaves, although I've no doubt that

3    Mr. Koenck will behave, but this Court's relied on it as a

4    3553(a) factor in the past, and I think it's certainly relevant

5    here where a guideline sentence would be effectively a life

6    sentence.

7            So beyond that, if the Court has any questions,

8    obviously glad to answer them, but those are the bases for

9    Mr. Koenck's motion for a downward variance, Your Honor.

10           THE COURT:  Well, turning to the Craig decision,

11   actually the facts in Craig were in some ways more egregious

12   than here, at least in terms of the guideline calculations

13   because I think the defendant scored -- I have it in front of

14   me, and I just noticed the defendant had a total offense level

15   of 43.

16           MR. HANSEN:  I think that's right, Your Honor.

17           THE COURT:  So it was a life sentence, but the

18   statutory maximum was 30 years.

19           MR. HANSEN:  Right, right.

20           THE COURT:  On that point, what do you think of a

21   guideline, at least in the Craig case -- it's not true in this

22   case, but in the Craig case what's the rationale for a guideline

23   computing a sentence that's life when the statutory maximum is

24   30 years?  What is the possible rational basis for the guideline

25   in that sentence?

1    MR. HANSEN:  I don't think there's any rational basis

2  for a guideline to exceed a statutory maximum, Your Honor.  I

3  believe we've had that in a case that Mr. Smart argued here

4  where the guideline sentence was life but the maximum was 30

5  years.

6    THE COURT:  Oh, I've had that in -- I've had a

7  guideline range exceed the statutory maximum on many occasions.

8    MR. HANSEN:  I'm sure.

9    THE COURT:  And I'm just -- I'm trying to figure out

10  what the possible rational basis for that could be by the

11  commission.

12    MR. HANSEN:  I don't think there could be any rational

13  basis for the guidelines to provide for a sentence that is

14  greater than Congress mandates is possible under circumstances.

15  I don't think there's anything, whether empirical in nature or

16  otherwise, that can support a guideline sentence such as that.

17    THE COURT:  But that doesn't apply to this case

18  because none of the guideline ranges exceed the statutory

19  maximum.

20    MR. HANSEN:  That's correct, Your Honor.

21    THE COURT:  Anything else you'd like to argue?

22    MR. HANSEN:  Not at this time, Your Honor.

23    THE COURT:  I notice the government did -- oh, yeah,

24  they did file a sentencing memorandum.  I'm sorry.  But I don't

25  believe you addressed United States versus Craig.  So have you

1   read United States versus Craig?

2           MR. DUAX:  No, Your Honor.  I've only read the

3   portions that were cited in the defendant's memorandum.  I

4   didn't prepare this memorandum.  I didn't look at the Craig

5   case.  I apologize, Your Honor.  I should have done so.

6           THE COURT:  Well, yeah, that's my next question.  Is

7   it too much of me to expect, particularly when the defendant

8   doesn't cite a whole lot of cases and one of their primary

9   arguments is based on a case, in this case United States versus

10  Craig, that the government lawyer would have read it and be

11  prepared to argue it?

12          MR. DUAX:  No, Your Honor.

13          THE COURT:  I mean, I read it.

14          MR. DUAX:  I apologize.  I should have read the case

15  and been prepared to discuss it.  I did not.  That's my fault.

16          THE COURT:  Well, then I won't ask you about it.

17  What's the government's position?

18          MR. DUAX:  Your Honor, with respect to the part of the

19  variance motion that dealt with the offender guidelines, I think

20  it was addressed in Newhouse at page 968 of your opinion in

21  Newhouse -- and I quote -- I recognize that some offenders have

22  earned career offender status and should be sentenced within the

23  career offender guideline and in rare instances higher.

24          I think in this case, when you do look at the more,

25  when you do look at the 3553(a) factors with respect to this

defendant, this offense, and this defendant's history and characteristics, that he fits in that statement, that he has -- by virtue of his two prior convictions, one in this court, has earned career offender status and also when you look at the nature of these offenses that they weren't products of impulse. They required planning and grooming and repeated contacts and then travel across state lines to meet and that these things were done in the present case by a defendant who was 52 years old who had already been convicted, had already served prison time for the very same offense to come back and do this again, to do it without remorse.

I think along those lines in the presentence report in paragraph 12, there are some chats from June of 2011 in which the defendant actually seems to be bragging about his prior offense where he says, "I did four years in prison, Google me, Timothy P. Koenck."

So, you know, that's the opposite of remorse. I mean, that's essentially trying to gain credibility on the back of his prior offense.

And so when you look at all of those things, this is clearly someone who has -- it's not a Newhouse situation. This is someone who based on their 3553(a) factors and characteristics is clearly a career offender, and this conduct has gone on for a long time, his initial offense. I think he was convicted in 2000 and up to now.

He's been through prison. He's also been through
quite a bit of treatment. He went to treatment between his
state conviction and his first federal conviction. And then
after Your Honor sentenced him, he went through 3 years of sex
offender treatment between 2005 and 2008, and then he was
released, and within 4 years we have him back again on
incredibly egregious conduct, I mean, grooming -- you know,
grooming a 12-year-old girl and then, you know, engaging in
sexual contact, hands-on contact, with her.

So in terms of looking at the (a) factors, he hits all
of them, and he hits all of them in an aggravating way.

In terms of the part of the argument on behalf of the
defendant where he points to the defendant's recommendations
from the community, I think you have to acknowledge -- when you
evaluate those recommendations, you have to evaluate this
defendant's ability to manipulate people. In the span of
approximately a month, he starts at ground zero first contact
with a 12-year-old girl, and within a month he has this girl
willing to meet with him and travel to a hotel with him. He's a
master manipulator.

He convinced -- in the offense before Your Honor, he
convinced a girl from Louisiana to spend 4 days with him, and we
have insight into what happened during those 4 days again in
paragraph 12 in the chats where he describes the best thing that
she let him do which was a horrible thing.

1          And so you have to acknowledge that this individual,

2    you look at him, he looks like an ordinary guy, but he has an

3    ability to manipulate that I think most of us would find hard to

4    duplicate.  And that ability to manipulate may be involved in

5    why he's able to portray outwardly this individual who's just a

6    great guy while he's out doing all of the things that are in

7    this presentence report.  I mean, there's other -- other victims

8    in here too, 15-year-olds, 16-year-olds.  And all that's going

9    on simultaneously with this outward facing conduct that inspires

10   these letters.

11          THE COURT:  And a 23-year-old intellectually

12   challenged woman.

13          MR. DUAX:  That was in a paragraph that the defendant

14   objected to, and so I'm not going to refer to that.

15          THE COURT:  Yeah, okay.

16          MR. DUAX:  But that was in the PSR.  But in other

17   paragraphs that were not objected to --

18          THE COURT:  Right.

19          MR. DUAX:  -- you had individuals in Wisconsin and

20   Minnesota where he sent e-mails, he sent an 8-page story

21   fantasizing about having sex with a 15-year-old girl.

22          And so when you look at his history, his

23   characteristics, what you see is an individual who's just not

24   going to be stopped, that if he's in the public he is going to

25   be out there, he is going to be committing offenses.

1       Even though I have not read the Craig case from the

2  defendant's brief, the point of it seemed to be that he should

3  receive leniency because he's older and because if you give him

4  the guideline sentence it will be an extremely long sentence.

5       However, when you consider the nature of this

6  particular offense, it just simply does not require a great deal

7  of physical strength to overpower a 12-year-old girl.  He does

8  most of his work -- when he commits this offense, the type that

9  we're here for today, the type that we were here for on his

10  prior conviction in front of Your Honor, he does most of that

11  work on the computer through chats, on the phone, through texts,

12  and that doesn't require physical strength at all.

13       And so to say that he's less likely to recidivate,

14  absolutely true.  But is he still able to recidivate?  Again,

15  absolutely true.  And what are the consequences of his

16  recidivism?  What happens if he recidivates?  You have a very

17  young girl whose life is going to be twisted and damaged for the

18  rest of her life.  And that's why, with all due respect to Judge

19  Posner, I don't agree with the conclusion.  Again, I didn't read

20  all the facts, and maybe there's something in there that would

21  make me agree with it.

22       THE COURT:  I doubt it.

23       MR. DUAX:  But the general --

24       THE COURT:  I don't agree with much of it.  I'm sure

25  you wouldn't.  I mean, it's very interesting, but I'm not sure

he's got -- his social science data is all that accurate.

MR. DUAX:  I saw data that -- again, and I apologize, Your Honor.  There's no excuse for me not reading Craig.

THE COURT:  You don't -- once is enough.  Once is enough.

MR. DUAX:  And -- but I know in Almazan in your orders -- in your order in Almazan you cited different statistics about recidivism with respect to people who have a very clearly demonstrated sexual interest in children which this defendant does, and that led to a different conclusion, in the government's view the correct conclusion, which is that this individual's been through everything he can be through in order to deter him, and it didn't work.  And the consequences of his future offending are so severe that it requires a long sentence.

And to give him some sort of variance or windfall in exchange for some --

THE COURT:  Well, wait a minute.  I take exception to the fact that a variance is a windfall.

MR. DUAX:  Poor choice of words.

THE COURT:  Have you ever heard a court describe it that way?  A variance is earned by the judge's analysis of the 3553(a) factors.  I don't view that -- a windfall is something that's undeserved.  Now, the government may disagree with the judge's view about whether it's deserved or not, but we're not out here handing out variances as a matter of windfalls.

1          MR. DUAX:  I agree w --

2          THE COURT:  Are we?

3          MR. DUAX:  No, we're not.

4          THE COURT:  Okay.

5          MR. DUAX:  I think it would be a windfall if he

6  received a variance for --

7          THE COURT:  That's a different question, sure.

8          MR. DUAX:  Because that's an opinion.

9          THE COURT:  Yeah, right.

10         MR. DUAX:  That it would be a windfall if he received

11  a variance in order to motivate him to be a good prisoner.

12         THE COURT:  Well, what's --

13         MR. DUAX:  I think that's his obligation regardless of

14  what sentence Your Honor gives him.  His obligation is to be a

15  good prisoner and to do what he's told to do while he's in

16  prison.  To try to ask for a lower sentence in order to -- you

17  know, if you don't, I'm going to behave badly, I don't think --

18  that doesn't seem to be a very -- a very fair rationale there or

19  something that --

20         THE COURT:  Well, one of Posner's points was that -- I

21  think what he called excessively long sentences really don't

22  have any deterrent value, and he goes through his typical kind

23  of economic analysis of that.  So in this case I think the

24  Posner view would be that a judge ought to con -- he didn't

25  dictate what a judge ought to do.  He just said a judge ought to

1    carefully consider whether in this case the mandatory minimum

2    240 months provides sufficient deterrence compared to, for

3    example, the bottom of the guideline range which is 355 months.

4    What's the value of that extra 115 months in terms of either

5    deterrence to this defendant or in terms of general deterrence?

6             And he goes on to argue that a defendant who's going

7    to commit this crime would not be deterred by knowing that, gee,

8    they're going to get a 355-month sentence, but they would be

9    deterred by a -- I guess I had that wrong; I flip-flopped it --

10   that a 355-month sentence would be needed for deterrence when a

11   240-month sentence wouldn't deter?  What's your response to that

12   argument?

13            MR. DUAX:  In this particular case, specific

14   deterrencewise, you'd have an extra ten years in which children

15   would be living in a Koenck-free environment which would be

16   great, much, much safer, very much worth doing.  And

17   particularly in light of the fact that, as I've discussed, given

18   the nature of his offenses, because they don't require a great

19   deal of physical strength in order to perpetrate, he would still

20   be at risk to reoffend for a lot of different reasons other than

21   just that.  So the ten years specifically where he's out of

22   circulation would definitely protect the public from him in a

23   better way.

24            In terms of general deterrence --

25            THE COURT:  Yeah, that's a specific deterrence

1   argument, right.

2           MR. DUAX:  Correct.

3           THE COURT:  Yeah.

4           MR. DUAX:  In terms of general deterrence, one of the

5   things that we know about this defendant in a much more specific

6   way than we know about other defendants a lot of times is that

7   he was on the chat rooms basically chatting with other people

8   that at least were to a degree like him.  I think he says it's

9   so awesome to finally find a person that thinks these things are

10  cool.  And during the course of that he tells this other person

11  what he got, what his sentence was.

12          And so in terms of general deterrence, the number --

13  will 355 or 360 months shock somebody who hears that more than

14  240?  Sure.  It's a bigger number.  The bigger the number the

15  more the shock value.

16          And so obviously you're looking at these if you're

17  using kind of a -- I don't know what all lines in the graph

18  Posner had running at the same time, but, you know, obviously

19  there's a slope of the line of deterrence.  The number -- what

20  if the number was a thousand years in prison?  That would have a

21  deterrent level, and 20 years would have a lower one, and

22  there's a slope of that line in terms of its effect on the

23  people that Koenck might come into contact with or people who

24  would hear of what Koenck gets today in his community which they

25  will.

1    And poised against that line is the line of how much
2  does it cost to incarcerate someone for the extra ten years and,
3  you know, or to whatever number that you choose.

4    And so those lines run, and I suppose what you're
5  being asked to do is to evaluate thoughtfully is there a point
6  where the deterrent value slope is so low and the cost is so
7  steep that you would then switch from deterrence and address
8  cost.

9    And with respect to the nature of the harm that this
10  defendant causes, I don't think that's ever going to be a really
11  good trade.  If you saved sixty or seventy thousand dollars for
12  ten years, yeah, that adds up to quite a bit of money.  But in
13  terms of keeping the community of his victims, 12-year-olds or
14  15-year-olds, safe, it's worth paying that amount to do that.

15    And again, will the bigger number have a bigger
16  effect?  Common sensewise tells you yes.  In terms of judging
17  the degree to which it will, hard to say.  Hard to say what the
18  slope of that line is.  You know, I don't know.  And people in
19  the community, if they read a 30-year sentence in a press
20  release, is that -- what does that tell them vis-a-vis a 20?
21  Well, it's 10 years more.  It's more severe.

22    THE COURT:  Well, that's one thing Posner criticizes
23  the Department of Justice for which I've never -- I've
24  criticized DOJ a lot but never for what Posner did, and that was
25  he says you don't get out into the community enough what the

sentences are.  That's not been my experience.  I think you're

pretty good about making that information available in press

releases.  So that's a back-handed compliment.

MR. DUAX:  Thank you, Your Honor.

THE COURT:  What about -- what about -- you weren't

the lawyer in Newhouse.

MR. DUAX:  I was not.

THE COURT:  Yeah.  But you're familiar with it.

MR. DUAX:  Yeah, generally, yeah.

THE COURT:  Yeah.  Do you think there are any

differences in the victims in Newhouse versus this case that

would justify -- well, there are many reasons why one could not

follow Newhouse in this case.  But I was wondering if the

government had any view about the difference in victims.  And

then I'm going to come back to you, Mr. Hansen, on that as well.

MR. DUAX:  The victim of someone who sells illegal

drugs, assuming that they're -- I mean, if they're a minor,

that's one question.  Is that the Court's question, what's the

difference between a minor who's sold drugs by a Newhouse and a

minor who's sexually violated by Koenck?

THE COURT:  Well, it's a little -- no, it's different

than that.  In Newhouse the predicate offenses were -- she was

in a hotel room with, I think, four or five other people, and

there were small amounts of meth and maybe seven to ten

psilocybin mushrooms, something like that.  And as a result she

1  never got a day even in jail let alone prison.  So the victims
2  on her predicate offenses were I guess -- the presentence report
3  says there's no identifiable victim.  I always chafe a little
4  bit at that.  While that's true there may not be identifiable,
5  to the extent that that suggests there are no victims, that's
6  inaccurate.  Maybe it doesn't suggest that because society's a
7  victim in drug cases, and they're actually real victims from the
8  sale and use of it.

9       But is there an appreciable difference in the victims
10 in Newhouse versus this case that in and of itself might justify
11 not following Newhouse?  Do you catch the drift of that?  Or
12 not?

13      MR. DUAX:  I understand you're asking me to talk about
14 different types of victims.  In terms of -- can you say it one
15 more time, Your Honor?  I want to make sure I follow.

16      THE COURT:  Yeah, in terms of whether or not to grant
17 relief from the career offender guideline.  See, in Newhouse --

18      MR. DUAX:  Yes, I think there are differences in
19 victims.  And could you use those differences to disagree with
20 the -- with the guidelines?  Absolutely I think so because it
21 would go to the harm that's perpetrated by the defendant which
22 if you look at the (a) factors, the consequences of the offense,
23 the characteristics of the offense are part of that calculus.
24 And so I think yes.  I think you could consider it on a variance
25 and line it up against that guideline and see -- see how it's

1  stacked up.

2          THE COURT:  Okay.  Anything else you'd like to argue?

3          MR. DUAX:  No, Your Honor.

4          THE COURT:  Okay.  Thank you, Mr. Duax.

5          Mr. Hansen?

6          MR. HANSEN:  Thank you, Your Honor.  Specifically as

7  to the Court's last question to the government on the

8  distinction between the victims in a Newhouse-type case and a

9  4B1.5(a) case, I think, you know, it would take some severe

10 mental gymnastics for me to say that they're equivalent in terms

11 of the victims.  I think the -- there's a more specific victim

12 in any case like this than there is in a drug case, so I think

13 that's -- I think that's a given.

14         THE COURT:  And wasn't that part of the reason why I

15 didn't agree with you last time because they were crimes of

16 violence which I viewed and I think I'm entitled to view under

17 Kimbrough as more serious than the lower-level drug offenses?

18         MR. HANSEN:  Right.

19         THE COURT:  Right.

20         MR. HANSEN:  I agree.  I think obviously at best I can

21 get a quasi-categorical policy disagreement on 4B1.5(a) from the

22 Court.  And, you know, although I do think that the problems in

23 that guideline are universal, they're present in every case, I

24 agree.  If the Court kind of follows down the road it's been

25 going down on the career offender cases, I might have a pretty

1  tough time on my first argument for a variance.

2          THE COURT:  Can I interrupt you for another question?

3          MR. HANSEN:  Sure.

4          THE COURT:  Do you know of any court anywhere that has

5  expressed a policy disagreement with 4B1.5(a)?

6          MR. HANSEN:  Your Honor, I can say that I researched

7  this for hours and hours and hours, and I did not find one, so I

8  have to grant that as well.

9          THE COURT:  I'm not surprised you --

10          MR. HANSEN:  Right.

11          THE COURT:  You're always so incredibly thorough that

12  I'm not surprised about your research.  I didn't really know the

13  answer, but I suspected it was nobody has.

14          MR. HANSEN:  It was surprising to me that there are

15  very few -- published isn't the right word but very few opinions

16  that have made it to the Westlaw and Lexis discussing in any

17  depth 4B1.5 or 4B1.5(a) specifically.

18          So yeah, there's certainly no case in which a court

19  has expressed a policy or a quasi-categorical policy

20  disagreement with 4B1.5(a) or 4B1.5 more generally.  But to be

21  frank, there are no cases really discussing it at all in terms

22  of offering any critiques or support for the guidelines.  So

23  that is what it is.  I think --

24          THE COURT:  Why do you think that is?

25          MR. HANSEN:  Well . . .

1          THE COURT:  It probably happens much less frequently

2    in a sex offender case, a career offender guideline, than in a

3    drug case or crimes of violence.

4          MR. HANSEN:  I think that's right.  I pored over our

5    office's previous records and only found scant few cases in

6    which this guideline has come up, so I think that's one reason.

7    I honestly don't know when the career offender provision, the

8    original career offender provision, came about in the

9    guidelines.  But 4B1.5(a) is certainly newer, so I think that

10   explains it as well.  But I do think the primary reason is that

11   we see the regular career offender provision come up far more

12   often than this particular one.

13         Not to put words in the government's mouth, but I

14   think -- I think we're in agreement that there are -- there are

15   similarities between a case like this and a career offender

16   case.  I think we part on whether that's a basis for a variance.

17   So that -- I'll just leave that where it lie for now.

18         I did want to respond to the point about the letters

19   of reference that Mr. Koenck received.  And the government's

20   interpretation of why he has so much support is one

21   interpretation.

22         But what I see in here is not manipulation.  I see a

23   guy who did a lot of good things for his community, and I think

24   it speaks to the point in his sister's letter, Miss Bents -- A2

25   I believe it is, Exhibit A2 -- that this part of Mr. Koenck that

1   led to him being here is one part of him.  It's a really,

2   really, really, really bad part of him, but it's one part of

3   him.

4   I don't think that this manipulation or whatever you

5   want to call it spills over into other aspects in Mr. Koenck's

6   life.  And I don't think it negates the relevance and the

7   mitigating aspects of the letters reflected in Exhibit A.  So I

8   did want to say that on the 3553(a) grounds for a variance.

9   And then briefly on the idea of general versus

10  specific deterrence, we're all kind of at a disadvantage here in

11  that we can't see into the future 20 years or 30 years from now.

12  So in terms of specific deterrence, I grant as I granted in my

13  memo that, I mean, it's necessarily true that Mr. Koenck is less

14  likely to offend as the sentence goes up.

15  But the question is -- as the government pointed out,

16  is there a point at which the line kind of levels off and the

17  benefits of a longer prison sentence recede I guess for lack of

18  a better way to put it.  And I think it's a hard question for

19  both of us.  I mean, I don't know who Mr. Koenck's going to be

20  when he's 70, 75 years old.  The government doesn't know.  The

21  Court doesn't know.  So it's really -- I think it comes down to

22  a feeling from the Court based off of the years and years of

23  experience that you have with sentencing people how you feel

24  about that.

25  But in terms of general deterrence, you know, again,

1    we don't have statistical data to say what the shock value is

2    for a 240-month sentence versus a 360-month sentence versus

3    something worse.

4         I can just say as a matter of common sense if I were

5    sitting for some reason on the Department of Justice website as

6    I'm sure many people are reading press releases and I saw that

7    an individual was sentenced to 240 months in prison or something

8    slightly more than that for a crime like this, that would get my

9    attention.  That is a long, long prison sentence.

10        THE COURT:  Yeah, I can't imagine actually any

11   rational human being saying, oh, gee, I'll commit the crime if

12   I'm only going to get 240 months, but, boy, if I'm going to get

13   355 months, I'm not -- it's going to deter me from committing

14   the crime.

15        MR. HANSEN:  Right.

16        THE COURT:  I think that's pretty much nonsense

17   actually.

18        MR. HANSEN:  I think that's right.  And from having

19   read press releases from DOJ, I know they say right in there

20   that it's 240 months without parole.  So that wouldn't be

21   anything that would soften the blow of such a sentence.

22        So while specific deterrence, I recognize there are

23   reasons to believe that a longer sentence would necessarily

24   deter Mr. Koenck from doing something.  And in terms of general

25   deterrence, I really don't think there's any support for the

1   idea that as the sentence goes up there's any real incremental

2   value in deterring the public so . . .

3         THE COURT:  I think if there was there'd be a lower

4   homicide rate in jurisdictions that have the death penalty.

5         MR. HANSEN:  One would think so, Your Honor.  So with

6   that I think I've responded to what I wanted to respond to but

7   obviously, again, glad to answer any questions.

8         THE COURT:  I'm out.

9         Mr. Duax, anything else you'd like to add?

10        MR. DUAX:  No, Your Honor.

11        THE COURT:  Okay.  Thank you.  Mr. Koenck, you have

12  the right to -- as you know from appearing in front of me before

13  but I still have a legal obligation to repeat it, you have the

14  right to say anything to me you want to.  You don't have to say

15  anything.  You have a right to remain silent.  If you exercise

16  your right to remain silent, I will not hold it against you in

17  any way.  But if you'd like to say something, I'd be happy to

18  hear from you.  Is there anything you'd like to say?

19        THE DEFENDANT:  No thank you, Your Honor.

20        THE COURT:  Okay.  Okay.  In this case I find the

21  total offense level is 34, criminal history category 5, advisory

22  guideline range of 235 to 293 months on Counts 1, 6, and 7 and a

23  120-month consecutive sentence on Count 1.  All the counts carry

24  a mandatory minimum 10-year sentence.  Count 1 carries a maximum

25  of life, Count 6 and 7, 20 years.

1           I spent a lot of time thinking about the sentence in

2    this case over a period of several days and reread the Craig

3    case.  And, Mr. Hansen, I agree with the thrust of your argument

4    that this particular guideline suffers from some of the

5    deficiencies that I found in the other career offender guideline

6    in terms of there's no empirical data, isn't based on any

7    expertise of the commission; it's really a congressional

8    directive.  And as you argued in your brief, I do not have to

9    give it as much credence -- or you had a better word for it --

10   less deference.  I don't have to give it as much deference as

11   guidelines where the sentencing commission has exercised its

12   institutional expertise and utilized empirical analysis.  And I

13   agree with that.

14           But having said that, ultimately I have to pick a

15   sentence that is sufficient but not greater than necessary to

16   achieve all of the sentencing purposes.  And I side much more

17   heavily with the government's analysis of the appropriate

18   sentence in this case than I do with your analysis.  I think if

19   there had been one predicate offense and it was older I might be

20   able to grant some relief.  But for whatever reason I'm stuck on

21   the fact that the guideline only requires one predicate offense

22   and there are two predicate offenses, and I believe the nature

23   of the victims in this case is infinitely more egregious than

24   the victims in the Newhouse case or low-level drug dealer cases

25   where I generally have a policy -- modified policy disagreement

1    with the guidelines.

2            And so one of the ways I figure out whether I have a

3    policy disagreement with the guidelines is I don't read the

4    guideline calculations in the order that they're presented in

5    the presentence report which I think most judges do.  I read the

6    nature of the offense and then the 3553(a) factors.  And then I

7    look at what I think really untethered to the guidelines which

8    we're really not supposed to do under Kimbrough and Gall and

9    even more recent cases saying that, you know, the guideline is a

10   starting place.  But my own view is if you do it as the starting

11   place, you're too anchored to the guidelines.

12           So what I like to do is I read everything but the

13   guideline calculations, and in this case I've never seen this

14   enhancement, so I had no idea what the guidelines would be, what

15   the calculations would be.  I just say what do I think is a

16   reasonable sentence?  And it's never a precise sentence.  It's

17   always a range.  And my range was not really -- was not

18   different than the guideline calculations which normally it is.

19   I think you know me well enough to know that, you know, I very

20   frequently grant relief from the guidelines because I think

21   they're too severe and too harsh.

22           In this case given the fact that he's a recidivist

23   offender and the impact on the victims is of such great

24   consequence, I don't find the guideline range to be different

25   than what I thought a reasonable sentence would be under the

1    overarching principle of sentencing, Title 18, 3553(a), trying

2    to come up with a sentence that is sufficient but not greater

3    than necessary.

4            And so in balancing the 3553(a) factors, I think there

5    are mitigating factors that you indicated.  I'm even willing to

6    give you the benefit of the doubt of your view of the mitigating

7    factors versus the government's more cynical view which, you

8    know, they have a right to be cynical, so I'm not -- I don't

9    mean that in a pejorative sense at all.  They have a right to

10   view it cynically, and I think a reasonable person could view it

11   that way.

12           But even giving the defense the benefit of the doubt

13   that Mr. Koenck has done a lot of good things for the community,

14   that does not outweigh the number of violations and the

15   seriousness of the violations and the impact that it has on the

16   victims.

17           And so with a heavy heart but trying to do this as

18   objectively as I can, it's my judgment that Mr. Koenck is

19   sentenced on Counts 1, 6, and 7 to the bottom of the guideline

20   range of 235 months, and on Count 2, I must impose a mandatory

21   120-month sentence consecutive.  And when I say with a heavy

22   heart, I really mean that because this means chances are greater

23   than not that Mr. Koenck is going to die in a United States

24   prison.

25           And actually I was doing some heavy-duty research this

weekend on a law review article I'm just finishing on average
life expectancy of inmates, and with the exception of
characteristics that Mr. Koenck does not have, there's really
strong evidence that the life expectancy in prison is much
shorter than it is elsewhere.

And so I realize that -- and when I say heavy heart,
you know, when I sentence somebody and I think they're going to
die in a United States prison, that's very, very hard on me, and
I do it with the greatest of reluctance. And recognizing that
that's probably going to happen, I have to overcome my emotional
response because I think the sentence that I've just imposed is
a reasonable sentence. And I just want to make clear I'm not
giving the guidelines any presumption of reasonableness. I
never do. Matter of fact, you know, my view is just the
contrary. I kind of go into sentencing with a general
impression that the guidelines are presumptively unreasonable
and presumptively harsh. But in this case I don't -- I just
don't find that to be.

So I know you don't agree with my sentence, and I
don't expect you to, but I would like the benefit of the doubt
that even though you have an absolute right to disagree with it
you know that I gave this sentence as much thought as I've given
any other sentence I've ever imposed. And I spent a lot of time
on deciding what an appropriate sentence would be because
depriving somebody of their liberty should never be easy, and it

 1  should never be done in a routine, mechanical guideline-like

 2  fashion.  At least I'm unable to do it that way.

 3          So upon release from imprisonment which I hope

 4  happens, you'll be placed on supervised release for 10 years on

 5  Counts 1, 6, and 7 and 3 years on Count 2 to run concurrently.

 6  While you're on supervised release, you'll have the standard

 7  conditions.  You can't violate any state, local, or federal law.

 8  You can't possess any illegal drugs.  You cannot possess a

 9  firearm, ammunition, destructive device, or dangerous weapon.

10  You'll cooperate in the collection of a DNA sample.

11          You'll have a number of special conditions because

12  this is a sex offender case.  So you'll participate in any

13  mental health evaluation and treatment including any sex

14  offender treatment program.  You'll take any medications

15  prescribed by a licensed physician.  You're prohibited from

16  owning or having in your possession any pornographic materials

17  of any kind.

18          You shall submit to a polygraph examination as a

19  containment strategy for the management of your sex offender

20  treatment.  You're prohibited from using photographic equipment,

21  computers, or any electronic storage device to view or produce

22  any child pornography.

23          You shall not have any contact with any children under

24  the age of 18 including through letters or any other type of

25  communication device without the prior consent of your United

1  States probation officer.  You're prohibited from going to

2  places where minor children under the age of 18 congregate such

3  as parks, beaches, pools, daycare centers, playgrounds, and

4  schools without prior permission from your United States

5  probation officer.

6         You must remain in compliance with all of the offender

7  registration and public notification requirements of the Adam

8  Walsh Child Protection and Safety Act of 2006.

9         You'll be subject to the standard search conditions

10  which means United States probation officers can search your

11  person, residence, place of employment, computers, cellphones,

12  cameras, and the like if they have reasonable suspicion you're

13  violating your supervised release.  And any computer or

14  electronic storage device or other electronic device will be

15  subject to random, periodic, unannounced monitoring and searches

16  by the United States Probation Office.

17         You don't have the ability to pay a fine, so the fine

18  is waived.  There's a $400 special assessment of a hundred

19  dollars on each count due and owing.  You're remanded to the

20  custody of the United States marshal to serve this sentence.

21         There's an appeal waiver in this case which means

22  you've given up your right to appeal.  So unless the sentence

23  that I imposed is illegal, unconstitutional, or in violation of

24  the plea agreement, you have no right to appeal.  In those very

25  limited situations, if you decide to appeal, you need to file a

1  written notice of appeal with the clerk of our court no later

2  than 14 days from the date your judgment is filed.  If you can't

3  afford to pay for a lawyer, pay for the costs of an appeal,

4  those costs will be paid on your behalf.

5          I'd ask the U.S. marshals to accommodate a family

6  visit.

7          And, Mr. Hansen, is there anything further on

8  Mr. Koenck's behalf?

9          MR. HANSEN:  Just one brief thing, Your Honor.

10 Mr. Koenck would like to request a recommendation of a BOP

11 facility as close as possible to Green Bay, Wisconsin, where his

12 sister who's here today lives.

13         THE COURT:  Okay.  I'll be glad to make that

14 recommendation to the Bureau of Prisons.

15         MR. HANSEN:  Thank you, Your Honor.

16         THE COURT:  I wanted to thank you, Mr. Hansen, for

17 your conscientious representation.  I thought you wrote a really

18 terrific brief on a very, very difficult factual and legal case.

19 So I know both of you are disappointed in the result, but it

20 wasn't from a lack of effort by the lawyer.

21         MR. HANSEN:  Thank you, Your Honor.

22         THE COURT:  So I appreciate your hard work very much.

23         And anything further on behalf of the United States,

24 Mr. Duax?

25         MR. DUAX:  Your Honor, just to move to dismiss Counts

1  3, 4, and 5.

2          THE COURT:  And I'm sure the defense has no objection

3  to that.

4          MR. HANSEN:  No objection, Your Honor.

5          THE COURT:  Those counts are dismissed.  Thank you.

6  We'll be in recess.

7          (The foregoing sentencing was

8          concluded at 2:22 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24
        s/ Shelly Semmler                4-4-17
25      Shelly Semmler, RMR, CRR         Date